IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

DOYLE R. MONDAY and )
MALLORY STATION GROUP, )
 )
    Plaintiffs, )
 )
v. ) No. 3:08-0789
 ) Judge Nixon
REGIONS BANK, ) Magistrate Judge Bryant
 )
    Defendant. )

## MEMORANDUM AND ORDER

Pending before the Court is Defendant Region Bank's ("Defendant") Motion for Judgment on the Pleadings ("Motion for Judgment on the Pleadings") and supporting Memorandum (Doc. Nos. 10 & 11), to which Plaintiffs Doyle R. Monday and Mallory Station Group ("Plaintiffs") filed a Response (Doc. No. 14) and Defendant filed a Reply (Doc. No. 18). Also pending is Defendant's Motion for Summary Judgment ("Motion for Summary Judgment"), supporting Memorandum, Statement of Undisputed Facts, and other supporting papers (Doc. Nos. 23-27). Plaintiffs filed a Response in Opposition, supporting Memorandum, Statement of Disputed Material Facts, and other supporting papers (Doc. Nos. 30-34) to which Defendant filed a Reply (Doc. Nos. 35-37). Plaintiffs filed a Motion for Leave to File Supplemental Response and to Postpone Ruling on Summary Judgment Motion (Doc. Nos. 38, 39, 42, & 43) to which Defendant filed a Response in Opposition (Doc. Nos. 40, 44, 45, & 46). For the following

reasons, Defendant's Motion for Summary Judgment is **GRANTED** and Defendant's Motion for Judgment on the Pleadings is **DENIED AS MOOT**.

Also pending is Plaintiffs' Motion to Ascertain Status (Doc. No. 48). With the entry of this Memorandum and Order, Plaintiffs' Motion to Ascertain Status is **GRANTED**.

I. BACKGROUND[1]

Plaintiff Doyle Monday is a licensed attorney and real estate appraiser who owns and operates several mini-storage facilities in the Nashville area. Plaintiff Monday's company, Plaintiff Mallory Station Group ("MSG"), owns one of these facilities.[2] Defendant Regions Bank is an Alabama banking corporation registered to do business in Tennessee. In March 2005, Regions banker Buddy Cutsinger ("Cutsinger") approached Plaintiff about refinancing two existing commercial Regions loans. Cutsinger suggested Plaintiff refinance with a Regions product called a CaRLA, a Customized Lock Rate Agreement. A CaRLA is a loan agreement in which a derivative[3] is used to hedge the risk[4] in order to give the borrower a fixed-rate of interest rather than a floating-rate of interest. As with all such products, if the borrower chooses to

---

[1] Unless otherwise noted, all facts are undisputed and taken from Plaintiffs' Response to Defendant's Statement of Undisputed Material Facts Filed in Support of Defendant's Motion for Summary Judgment (Doc. No. 33) and Defendant's Response to Plaintiffs' Statement of Disputed Material Facts (Doc. No. 37).

[2] Throughout the Order, the Court will refer to Plaintiff Monday as "Plaintiff" and Plaintiffs Monday and Mallory Station Group collectively as "Plaintiffs." Because Plaintiff Monday owns Plaintiff Mallory Station Group, the Court will use Plaintiff when it makes sense in the context of negotiations, etc.

[3] A derivative (short for derivative instrument) is an agreement between parties that can either gain or lose value based on the fluctuation in value of the underlying asset. Unexpected movements in interests rates can adversely affect the value of derivatives. (Doc. No. 25-24, at 3).

[4] A hedge is a financial position used to offset investment risk. It is designed to eliminate the possibility of future gain or loss. (Doc. No. 25-24, at 4).

payoff a CaRLA loan before the end of the term, the bank has to unwind the hedge.

Before entering into the CaRLA loans that are the subject of this dispute, Plaintiff had no experience with and had never entered into a loan agreement with a swap or derivative component. Plaintiff expressed interest in the CaRLA, but asked Cutsinger for more information; he was especially concerned about the consequences of an early payoff of the loan. In response, Cutsinger provided Plaintiff with Indicative Term Sheets and a PowerPoint presentation created by Regions Capital Markets[5] and customized for Plaintiff. (Doc. Nos. 25-9 & 25-10). Through a series of telephone and in-person meetings between Plaintiff, Cutsinger, Regions banker Allan Joiner, and Regions Capital Markets Derivatives Marketer Justin Harp, the Regions representatives presented the CaRLA to Plaintiff and answered Plaintiff's questions about the loan. On May 27, 2005, over a recorded phone line, Plaintiff locked in an interest rate of 5.16% for the Monday CaRLA and the MSG CaRLA. During that call, Regions Capital Markets Derivatives Marketer Justin Harp said to Plaintiff:

> [T]he last thing we really need to go over with you, Mr. Monday, is that these transactions are being hedged in order to give you this fixed rate. If you should choose at any point in time to prepay a portion and/or all of the transactions, you will be subject to that provision, which basically says that prepayment will reduce those cash flows. And at that point in time, I will have to go in the market and replace them. If I'm able to do so at a rate higher than we're at today, there's going to be economic benefit because it takes less capital at the higher rate to produce those cash flows. But if that rate should be lower, it's going to be an economic cost because I will need more capital at the lower rate to produce the same cash flows.

On June 6, 2005, Plaintiff signed the CaRLA loan agreements.

The prepayment provision of the CaRLA provides:

---

[5] A capital markets company assists clients in managing risk or raising capital through nontraditional outlets, such as loan syndications and derivatives. (Doc. No. 34-3, at 12-13). Regions Capital Markets has no direct relationship with, but is a part of the same holding company as, Regions Bank. (Id., at 10-11).

-3-

Case 3:08-cv-00789  Document 49  Filed 03/04/10  Page 3 of 16 PageID #: 1968

> In the event of (i) a prepayment of all or any part of the Loan or (ii) an acceleration of the Loan, the amount to be paid by the Borrower to the Lender will be adjusted by an amount equal to the Loss determined by the Lender in respect of the principal amount of the Loan being prepaid or accelerated. For such purposes, "Loss" means the amount that the Lender reasonably determines in good faith to be its total losses and costs (or gain, in which case Loss shall be expressed as a negative number) in connection with the Loan (of affected portion thereof), including any loss of bargain, cost of funding, or, at the election of the Lender but without duplication, loss or cost incurred as a result of its terminating, liquidating, or obtaining, or re-establishing any hedge or related trading position (or any gain resulting from any of them). If such amount is a positive number, the Borrower shall pay such amount to the Lender on the date of such prepayment or acceleration; if such amount is a negative number, such amount shall be applied against the amount to be paid by the Borrower to the Lender. The Lender may, but need not, determine Loss by reference to quotations of relevant rates or prices from one or more leading dealers in relevant markets.

(Doc. Nos. 1-5, at 2 & 1-6, at 1).[6] The PowerPoint provided to Plaintiff contained this explanation for the unwinding of the hedge:

> If a client elects to prepay a CaRLA, Regions must unwind the hedge transaction in the capital markets at prevailing market rates. This may result in a gain or loss on the hedging transaction. Any economic impact to Regions when a transaction is unwound is passed on to the client. Therefore, CaRLA documents contain a "make whole" prepayment provision that stipulates an additional amount may be due to Regions in case of prepayment. However, the make-whole provision is considered "two-way" because the client will recognize either a benefit or cost in the event of prepayment.
>
> To determine any additional amount due, Regions will compare the Fixed Interest Rate with the rate for a replacement transaction in the market based on the remaining principal repayment schedule and term to maturity. If the replacement rate is higher than the Fixed Interest Rate, the client make recognize a benefit; conversely, if the replacement rate is equal to or less than the Fixed Interest Rate, the client may incur an additional cost.

(Doc. No. 25-10, at 4). The Indicative Term Sheets provided to Plaintiff, labeled "for discussion purposes only," also contained the text of the prepayment provision, along with a prepayment

---

[6]The pre-payment provisions of the Monday CaRLA and the MSG CaRLA are identical. (Doc. Nos. 1-5, at 2 & 1-6, at 1).

calculation explanation that is almost identical to one contained in the PowerPoint.[7]

The Indicative Term Sheets contain a section titled "Sensitivity Analysis" with a table described as "provid[ing] an example of what the *hypothetical* economic impact of interest rate changes may be based on the loan amount, terms, and rate stated above." (Doc. No. 25-9, at 3) (emphasis in original). The table, entitled "Benefit/Cost of Interest Rate Movements" is further qualified: "[t]hese figures assume a parallel shift in the yield curve. Any actual benefit or cost may vary from these calculations and will be subject to changes in market conditions." (Id.). On one axis the chart shows "time from today," on the other the rise or fall of interest rates by .5%, with the economic impact of those changes on the total amount of the loan. (Id.).

In early 2008, interest rates had dropped from their 2005 levels and Plaintiff began to explore refinancing options for the two loans at issue. On January 24, 2008, Allan Joiner, who in the meantime had left Regions Bank and joined Avenue Bank, provided Plaintiff a refinancing quote for a loan with different terms from Avenue Bank. On January 29, 2008, Regions provided Plaintiff with prepayment calculations for the Monday and MSG CaRLAs, plus two additional CaRLAs entered into by Plaintiff after the loans at issue here. (Doc. No. 25-14). The unwind for the Monday CaRLA was $129,598.80 and the unwind for the MSG CaRLA was $149,264.75. Plaintiff was shocked by the prepayment calculation–he believed the prepayment amount was too high and had not been calculated as indicated by the PowerPoint. For approximately one month, Plaintiff repeatedly contacted Phil McCutchan, Regions Bank Vice President, and Tom Curl,

---

[7]The Indicative Term Sheet Prepayment Calculation language reads: "To determine any additional amount due, Regions will compare the Fixed Interest Rate with a *replacement rate* in the market based on the remaining principal repayment schedule and term to maturity. If the replacement rate is higher than the Fixed Interest Rate the client make recognize a benefit; conversely, if the replacement rate is equal to or less than the Fixed Interest Rate, the client may incur an additional cost." (Doc. 25-9, at 3) (emphasis in original).

head of the Regions real estate group, regarding the prepayment calculation. On March 4, 2008, Plaintiffs' attorneys sent a letter to Regions demanding that the prepayment be recalculated "under the loan agreements consistent with the methodology presented to Mr. Monday and agreed to at the inception of the loans." (Doc. No. 34-9, at 2). On March 25, 2008, Plaintiff again requested a recalculation of the prepayment amount. Regions provided such information using the same methods as the January prepayment calculation. On July 14, 2008, Plaintiffs brought the instant action.

## II. STANDARD OF REVIEW

Summary judgment is appropriate when there is "no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Generally, summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Moses v. Providence Hosp. & Med. Ctr., 561 F.3d 573, 578 (6th Cir. 2009) (quoting Fed R. Civ. P. 56(c)). A genuine issue of material fact is "evidence such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The moving party has the burden of showing the absence of a genuine issue of material fact as to at least one essential element of the non-moving party's case, Celotex v. Catrett, 477 U.S. 317, 322-23 (1986), and that the evidence "is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251-52. Once the moving party has satisfied its burden,

-6-

Case 3:08-cv-00789   Document 49   Filed 03/04/10   Page 6 of 16 PageID #: 1971

the burden shifts to the non-moving party to set forth "specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). The Court must draw all reasonable inferences in favor of the non-moving party. See id.

## III. ANALYSIS

### A. Breach of Contract

Plaintiffs assert that Defendant breached the express terms of the CaRLA by failing to reasonably determine in good faith its total loss for prepayment purposes when Plaintiff requested the unwind calculation in January 2008. In the alternative, Plaintiffs argue that the January 2008 prepayment calculation constitutes repudiation or anticipatory breach. Defendant responds that Plaintiffs have failed to show nonperformance amounting to breach, and point to their expert's testimony and Plaintiff's own admission that Defendant met or exceeded the standards, customs, and practices of the banking industry in communicating about and ultimately calculating the prepayment penalty. For the following reasons the Court finds that no genuine issue of material fact remains concerning a breach of contract here.

For a breach of contract claim, a plaintiff must demonstrate: "(1) the existence of an enforceable contract; (2) nonperformance amounting to a breach of the contract; and (3) damages caused by the breach of the contract." C & W Asset Acquisition, LLC v. Oggs, 230 S.W.3d 671, 676-77 (Tenn. Ct. App. 2007) (quoting ARC LifeMed, Inc. v. AMC-Tenn., Inc., 183 S.W.3d 1, 26 (Tenn. Ct. App. 2005)). Neither Party argues that the Monday and MSG CaRLAs are not enforceable contracts. Rather, Plaintiffs assert nonperformance. The dispute centers on the prepayment provision regarding "loss" for unwind purposes:

> "Loss" means the amount that the Lender reasonably determines in good faith to be its total losses and costs (or gain, in which case Loss shall be expressed as a negative number) in connection with the Loan (of affected portion thereof), including any loss of bargain, cost of funding, or, at the election of the Lender but without duplication, loss or cost incurred as a result of its terminating, liquidating, or obtaining, or re-establishing any hedge or related trading position (or any gain resulting from any of them)."

(Doc. Nos. 1-5, at 2 & 1-6, at 1). Plaintiffs claim that in January 2008 the amount proffered by Defendants for the prepayment amount was not reasonably determined in good faith to be its total losses and costs for unwinding the hedge.

Parties to a contract owe each other a duty of good faith and fair dealing in performance of that contract. Barnes & Robinson Co., Inc. v. OneSource Facility Servs., Inc., 195 S.W.3d 637 (Tenn. Ct. App. 2006). The extent of the duty to perform in good faith depends upon the individual contract. TSC Indus., Inc. v. Tomlin, 743 S.W.2d 169, 173 (Tenn. Ct. App. 1987). "In construing contracts, courts look to the language of the instrument and to the intention of parties, and impose a construction which is fair and reasonable." Id.; see also, Covington v. Robinson, 723 S.W.2d 643, 645-46 (Tenn. Ct. App. 1986). The question of the parties' intent is "generally treated as a question of law because the words of the contract are definite and undisputed, and in deciding the legal effect of the words, there is no genuine factual issue left for a jury to decide." Planters Gin Co. v. Fed. Compress & Warehouse Co., Inc., 78 S.W.3d 885, 890 (Tenn. 2002) (citing Joseph M. Perillo, Corbin on Contracts, § 24.30 (rev. ed. 1998)).

A central tenant of contract construction is "the intent of the contracting parties at the time of executing the agreement should govern." Id. (quoting Empress Health & Beauty Spa, Inc. v. Turner, 503 S.W.2d 188, 1990 (Tenn. 1973)). The intent of the parties is presumed to be that specifically expressed in the body of the contract. Id. If clear and unambiguous, the literal

meaning of the language controls, provided such language does not conflict with any rule of law, good morals, or public policy. Id. (quoting 17 Am. Jur. 2d). When faced with a contract construction question, a court's initial task is to determine whether the language of that contract is ambiguous. Id. If the language of the contract is found to be ambiguous, the court applies established rules of construction to determine the parties intent. Id. If ambiguity remains, then the legal meaning of the contract becomes a question of fact for the jury. Id.

The language contained within the prepayment provision is not ambiguous. It states that the prepayment loss will be "the amount that the Lender reasonably determines in good faith to be its total losses and costs . . . in connection with the Loan" (Doc. Nos. 1-5, at 2 & 1-6, at 1). The parties intended that Defendant calculate in good faith its cost to unwind the hedge in the market. This intent is clearly shown.

However, Plaintiff disputes that the prepayment amount presented to him in January 2008 was calculated in good faith. In Tennessee, a question of good faith or reasonableness is often considered a question of fact. See Safeco Ins. Co. of Am. v. Criterion Inv. Corp., 732 F. Supp. 834, 841 (E.D. Tenn. 1989) ("What is 'good faith' depends, it is obvious, upon the facts and circumstances of each case.") (citing Tenn. Code Ann. § 47-2-201: "'Good faith' . . . means honesty in fact in the conduct or transaction concerned."). However the existence of a fact determination does not necessarily preclude summary judgment. 10A Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, Federal Practice & Procedure § 2725 (3d ed. 2009) ("The fact that difficult questions of law exist or that the parties differ on the legal conclusions to be drawn from the facts is not in and of itself a ground for denying summary judgment . . ."); Tomlinson v. Kelley, 969 S.W.2d 402, 405 (Tenn. 1997). Summary judgment may be

appropriate on a question of good faith or reasonableness where there is no dispute as to material facts and the movant is entitled to judgment as a matter of law. Old Republic Sur. Co. v. Eshaghpour, No. M1999-01918-COA-R3-CV, 2001 WL 1523364, at *8 (Tenn. Ct. App., Nov. 30, 2001) (upholding grant of summary judgment on question of good faith dealing).

Defendant's expert stated, and Plaintiff has admitted, that Defendant met or exceeded the standards, customs and practices of the banking industry in communications with Plaintiff in regard to the prepayment amount calculation and in calculating that amount. (Doc. 25-11, at 3-4 (Moore Declaration); Doc. No. 33, at 7, 13, 15). In their Response to Defendant's Statement of Undisputed Material Facts Filed in Support of Defendant's Motion for Summary Judgment, Plaintiffs admitted as undisputed for the purposes of the summary judgment motion the following statements: "Regions calculates the gain or loss under the two-way make whole provision of a CaRLA loans [sic] using a method that is industry standard for calculating make whole amounts for interest rate derivatives" and "Regions [sic] calculation of the unwind followed industry standard for such calculations." (Doc. No. 33, at 7, 15). There is no question that Regions calculated the prepayment amount according to industry standards.

According to Black's Law Dictionary, one definition of "good faith" is "observance of reasonable commercial standards of fair dealing in a given trade or business." Black's Law Dictionary (8th ed. 2004). Courts in this Circuit have used industry standards to determine good faith compliance under contract. See Lichtenberg Const. & Dev., Inc. v. Paul W. Wilson, Inc., 2001 WL 1141236, at *2-3 (Ohio App. 1 Dist., Sept. 28, 2001) (applying industry practice to question of good faith negotiations); United Magazine Co. v. Prudential Ins., Co., 877 F. Supp. 1076, 1083 (S.D. Ohio, 1995) (noting lack of evidence of industry standards for good faith

determination); Pezzillo v. Gen. Tel. & Elec. Info. Sys., Inc., 414 F. Supp. 1257, 1270 (D.C. Tenn, 1976) (applying industry standards to determination of good faith in employment practices). No reasonable jury could find that Regions acted in bad faith by calculating the prepayment amount according to industry standards. In providing the January 2008 prepayment amount to Plaintiffs, Regions did not breach or repudiate the CaRLA agreements.

Because the Court does not find a genuine issue of material fact remains regarding breach, it will not assess Plaintiffs' damages arguments contained in the original or supplemental briefing (Doc. Nos. 30-34, 38, 39). See 477 U.S. 317 at 323 ("The moving party is entitled to a judgment as a matter of law because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.").

### B. Plaintiffs' Claims Under the Tennessee Consumer Protection Act

Plaintiffs also claim that Defendant engaged in unfair and deceptive practices in violation of the Tennessee Consumer Protection Act ("TCPA"), Tenn. Code Ann. § 47-18-104, by: (1) misrepresenting the calculation of the prepayment amount in order to induce Plaintiffs to enter into the CaRLAs; (2) "failing to use the originally presented prepayment 'loss' calculation formula"; (3) failing to disclose that Morgan Keegan would be involved in the swap transaction contained in the CaRLAs; and (4) by including "the interest rate in the CaRLA loans [that] was not market-derived." (Doc. No. 1-1, at 10). Defendant moves for summary judgment, arguing that Plaintiffs' claims are barred as a matter of law under Tenn. Code Ann. § 47-18-111(a)(3), or, in the alternative, that Plaintiffs cannot show deceptive conduct or damages, and therefore Plaintiffs' claims fail.

The TCPA prohibits [u]nfair or deceptive acts or practices affecting the conduct of any trade or commerce." Tenn. Code Ann. § 47-18-104(a). The Act further defines "trade," "commerce," or "consumer transaction" as "the advertising, offering for sale, lease or rental, or distribution of any goods, services, or property, tangible or intangible, real, personal, or mixed, and other articles, commodities, or things of value wherever situated." Tenn. Code Ann. § 47-18-103(11). Plaintiffs do not specify a subsection of the TCPA in their complaint; however, in this briefing they identify section 47-18-104(b)(27) of the Tennessee Code which prohibits "[e]ngaging in any other act or practice which is deceptive to the consumer or to any other person" as applicable. (See Doc. No. 31, at 10).

Defendant argues that no cause of action by a borrower against a lender, with regard to any lending transaction, exists under the TCPA. For this absolute bar, Defendant points to section 47-18-111 and Kleto v. AmSouth Bank, No. 3:04-cv-243, 2005 WL 2573379 (E.D. Tenn. Oct. 12, 2005). Section 47-18-111 defines activities exempted from the Consumer Protection Act, including, "(3) [c]redit terms of a transaction which may be otherwise subject to the provisions of this part, except insofar as the Tennessee Equal Consumer Credit Act of 1974 . . . may be applicable." Tenn. Code Ann. § 47-18-111(a)(3). In Kleto, plaintiffs sued a bank when an oral promise to extend a loan for a condo purchase did not result in an actual loan. The district court granted summary judgment on plaintiffs' TCPA claim of misrepresentation by applying section 47-18-111(a)(3) and stating: "Thus, where a party would otherwise have a claim under the TCPA based upon a deceptive act or practice of a bank in connection with a credit transaction, such claims fall outside the scope of the Act . . . . Plaintiffs have cited to no authority, and the court has found none, to support their proposition that such a claim may be

brought under the TCPA." 2005 WL 2573379, at *6. The court in Kleto does read section 47-18-111(a)(3) as a broad bar against claims based upon "credit transactions;" however, other recent cases and the plain meaning of the statute suggest a narrower exemption.

In Laporte v. Wells Fargo Bank, N.A., the Eastern District of Tennessee recently rejected a similar absolute bar argument in the context of a motion to dismiss. No. 3:08-cv-376, 2009 WL 2146324, at *3-4 (E.D. Tenn. July 14, 2009). Plaintiffs asserted that agents of defendant fraudulently induced them to buy property financed via defendant bank's loans. After determining that the TCPA applied to transactions involving the sale of real property, the court found plaintiffs' claims did not relate to the credit terms of the transaction—the "actual terms of the loans" on the property—but rather "to the allegedly fraudulent inducement by agents of defendant to purchase the properties in the first place." Id. at *4. Similarly, other courts in our district have examined lender conduct in the context of the TCPA. See Beard v. Worldwide Mortgage Corp., 354 F. Supp. 2d 789, 815 (W.D. Tenn. 2005) (denying motion to dismiss TCPA claim where plaintiff pled "fraudulent and/or deceptive business transactions" induced her to refinance her mortgage); Terry v. Cmty. Bank of N. Va., 255 F. Supp. 2d 817, 823-24 (W.D. Tenn. 2003) (finding "allegations regarding misrepresentations made during the course of extending loans sufficient to plead a cause of action for violation of the TCPA"); Honeycutt v. First Fed. Bank, 278 F. Supp. 2d 893, 896-97 (W.D. Tenn. 2003) (applying TCPA to loan pre-approval letter without discussion of exemption provision, found language not to be deceptive under the Act).

The exemption itself reads "[c]redit terms of a transaction which may be otherwise subject to the provisions of this part," not "credit transaction." Tenn. Code Ann. § 47-18-
-13-

111(a)(3). The case law discussed *supra* further indicates that misrepresentations during credit transactions may fall within the purview of the TCPA. Therefore, the Court reads the exemption narrowly, as applying only to the *credit terms* of a transaction otherwise subject to the provisions of the TCPA.

The TCPA allows for a private right of action. Tenn. Code Ann. § 47-18-109. To recover under the TCPA, a plaintiff must prove: "(1) that the defendant engaged in an unfair or deceptive act or practice declared unlawful by the TCPA and (2) that the defendant's conduct caused an 'ascertainable loss of money or property, real, personal, or mixed, or any other article, commodity, or thing of value however situated.'" Tucker v. Sierra Builders, 180 S.W.3d 109, 115 (Tenn. Ct. App. 2005) (quoting Tenn. Code Ann. § 47-18-109(a)(1)). Defendant argues that Plaintiff cannot show deceptive conduct or damages, as required by the TCPA. Plaintiffs argue that the representations made by Defendant regarding the prepayment amount calculation were grossly over-simplified and misleading, and therefore deceptive and induced Plaintiffs to enter into the CaRLAs.[8]

Defendant presented Plaintiff with information regarding the existence of the prepayment amount, the method of calculating the prepayment amount, and charts showing the hypothetical economic impact of interest rate changes on the prepayment amount in the PowerPoint

---

[8]Neither Plaintiffs nor Defendant present Plaintiffs' three remaining TCPA claims in their briefs. The Court notes, however, that "failing to use the originally presented prepayment 'loss' calculation formula" is a "credit term" under section 47-18-111(a)(3) and therefore not covered by the TCPA as a matter of law. Similarly, although Plaintiff does not specify which interest rate they are referring to in TCPA claim four, the market-derived nature or not of that interest rate would also qualify as a "credit term" under section 47-18-111(a)(3). Finally, there is no evidence in the record to suggest that Morgan Keenan was a counter-party to the swap transaction. (See Doc. No. 34-3, at 11 (No relationship between Regions Capital Markets and Morgan Keegan besides being part of the same company) and Doc. No. 34-3, at 28-29, 33-35 (Capital Market trader places risk generated by swap transaction into the market, deponent did not know exactly where that risk was specifically placed)).

Presentation, the Indicative Term Sheets, telephone and in-person discussions with Plaintiff, and in the text of the CaRLA agreements themselves. Plaintiffs claim that because the sensitivity analyses—the charts showing cost/benefits of interest rate movements on the CaRLA by year—were constructed using a parallel shift in the yield curve these analyses were deceptive and misrepresented the potential real cost to unwind the hedge. However, Plaintiffs have also admitted that Defendant met or exceeded the standards, customs and practices in the banking industry in its communications with Plaintiff regarding the CaRLA product, including its prepayment provision. (See Doc. No. 33, at 13). Following the practices of the banking industry in communications with the customer regarding a loan product is not a deceptive practice.

The Plaintiff's assertions that he misunderstood the methods used to calculate the rate do not create a genuine issue of material fact regarding the nature of these communications. Although complicated, the information presented in the documents and via conversations with Plaintiff presented the replacement rate in the market as contingent on changes in market conditions and something Regions Capital Markets, not the banker representatives, would calculate while looking to variables throughout the remainder of the life of the loan. Discussions of the London Interbank Offered Rate ("LIBOR") appear only in connection with how the fixed interest rate to be locked in for the CaRLA will be calculated, as well as trends in interest rates generally. The examples of prepayment amounts are clearly marked as hypothetical and variable, and pegged to interest rate movements, not specifically LIBOR. Plaintiff's misunderstanding does not create a deceptive act out of Defendant's industry standard communications. A claim under the TCPA may be asserted if a defendant acted intentionally or negligently. See Holladay v. Speed, 208 S.W.3d 408, 416 (Tenn. Ct. App. 2005) (an unfair or deceptive act under the

TCPA may be intentional or negligent). Plaintiff has shown no evidence of intentional misrepresentation and Defendant's adherence to industry standards is not negligence. See Timoshchuk v. Long of Chattanooga Mercedes-Benz, 2009 WL 3230961, at *6-7 (Tenn. Ct. App. 2009) (seller's reliance on industry standard documentation not negligent under TCPA). Plaintiffs seem to be arguing that derivatives and swap-based products demand a higher level of consumer disclosure than is currently banking industry standard. However, no genuine issues of material fact remain in dispute regarding Plaintiffs' specific claims, therefore summary judgment is GRANTED.

IV. **CONCLUSION**

For the foregoing reasons, Defendant's Motion for Summary Judgment is **GRANTED** and Defendant's Motion for Judgment on the Pleadings is **DENIED AS MOOT**. The case is hereby **DISMISSED with prejudice**.

It is so ORDERED.

Entered this ____4th____ day of March, 2010.

_____
JOHN T. NIXON, SENIOR JUDGE
UNITED STATES DISTRICT COURT